BABCOCK *et al.* v. MIDDLETON *et al.*, COMMISSIONERS OF THE FUNDED DEBT OF THE CITY OF SAN FRANCISCO.

THE Act of May 1st, 1851, providing for the funding of the floating debt of the City of San Francisco, authorized a contract between the city and her creditors, and the contract having been executed, its obligation cannot be impaired by any subsequent modification or repeal of the act.

The provisions of the act, which are mere legislative modes to give effect to the substantial purposes of the act, may be altered, provided the alteration does not affect the security of the creditors, who have accepted the bonds of the city under the act.

The object of the provision of the act requiring a *public* sale of the property conveyed to the Commissioners of the Funded Debt, when a sale is made, is to secure a fair price from the purchasers. If this object can be accomplished by a sale in any other mode, the obligation of the contract is not impaired by legislation authorizing such other mode.

The Act of April 14th, 1862, authorizing the Commissioners of the Funded Debt to compromise and settle certain claims made to real estate held by them, and to convey such real estate, is not unconstitutional. Its only object is to provide a new mode for the disposition of those portions of the property which cannot be advantageously disposed of at public sale, in consequence of existing doubts as to the title of the Commissioners.

APPEAL from the Fourth District.

In the year 1850, the City of San Francisco, being greatly in debt, passed several ordinances for the creation of a "Sinking Fund Stock," for the payment, among other purposes, of the then existing city indebtedness; and, to carry out those objects, caused a conveyance of all the real estate of the city to be made to certain "Commissioners of the Sinking Fund," who were created by said

ordinances.   See the history of this plan, *Smith* v. *Morse*, (2 Cal. 526, 527.)

This plan failed to relieve the finances of the city, or to extinguish its debts.

In 1851, an attempt was made by some provisions of "An Act to Reincorporate the City of San Francisco," passed April 15th, 1851, (Laws 1851, 357) to ensure the funding of the city debt, which had then swelled to about $2,000,000, bearing an interest of three per cent. per month.   By article III, section 17 of the act, the Commissioners of the Sinking Fund were directed to convey to the city all the city property in their possession.   By article III, section 14, "the net proceeds of all real estate belonging or that might thereafter belong to the city, were constituted a sinking fund" for "the payment of the existing city indebtedness."   By article III, section 15, the Common Council were authorized to fund the then existing debt of the city.

But this plan was immediately repealed.   Another plan was devised, whose purpose was to enable the city creditor to exchange his claims against the city for funded bonds of the city, to be redeemable at the end of twenty years, bearing an interest of ten per cent. per annum, to the payment of the principal and interest of which all the revenue of the city should be primarily pledged, and to entrust the issue of said bonds, and the exclusive and inalienable management of the funds raised for the payment of the interest and principal of the same, to a Board of Funding Commissioners; and, with a view to these objects, on the first day of May, 1851, the Legislature passed "An Act to authorize the Funding of the Floating Debt of the City of San Francisco, and to provide for the payment of the same." (Laws 1851, 387.)

By sections one, two, three and four, of this act, Commissioners of the Funded Debt were created, who were to issue funded bonds of the city, exchange them for an equal amount of city indebtedness, and receive from the City Treasurer, out of the first moneys collected on the general assessment for each fiscal year, sufficient funds to pay the current interest on the funded debt, and the annual contribution to the sinking fund, provided for the final payment of the bonds.   By section ten, the Legislature repealed section seven-

Babcock *v.* Middleton.

teen, article III, of the act of 1851, reincorporating the city, which had directed the Commissioners of the Sinking Fund to reconvey to the city the property in their hands; and by section twelve, the Commissioners of the Sinking Fund were directed to convey all the property of the city to the Commissioners of the Funded Debt, who were empowered " to expose to public sale, or to lease the same," and to apply the proceeds to the payment of the city debt.

By section thirteen of the Funding Act, the Legislature repealed section fifteen, article III, of the act of 1851, reincorporating the city, which authorized the Common Council to fund the city debt, but did not repeal section fourteen, which devoted the lands of the city to the payment of its debts.

The following is the title, preamble, and first section of the Act of 1862, referred to in the opinion.　(Laws of 1862, 217.)

" *An Act to authorize the Commissioners of the Funded Debt of the City of San Francisco to compromise and settle certain Claims to Real Estate, and to convey such Real Estate, pursuant thereto.*

" WHEREAS, Pursuant to the provisions of section twelve of an act entitled ' an Act to authorize the Funding of the Floating Debt of the City of San Francisco, and to provide for the payment of the same,' passed May 1st, in the year one thousand eight hundred and fifty-one, certain real estate, formerly held by the town or city of San Francisco, was conveyed by the Commissioners of the Sinking Fund, mentioned in the said section of the said act, to the Commissioners of the Funded Debt of the said city of San Francisco; and, whereas, it is alleged that certain parcels of said real estate have never been sold, leased, dedicated, reserved, or conveyed, by the said Commissioners of the Funded Debt, but are in the actual possession of certain persons, who have purchased the same in good faith, and for valuable considerations, and who, by themselves, their tenants, or the persons through whom they claim and derive possession of the said lands, have been in actual possession of the same, from and including the first day of January, in the year one thousand eight hundred and fifty-five, and who

therefore claim to have become entitled to and possessed of all the right, title, claim, interest, and estate, of the said city of San Francisco, of, in, and to, the said lands, by them respectively occupied, as aforesaid, by virtue of the provisions of an act entitled an act concerning the city of San Francisco, and to ratify and confirm certain ordinances of said city, approved March 11th, in the year one thousand eight hundred and fifty-eight, and of the ordinances mentioned in the said last mentioned act, and particularly of the ordinance therein mentioned, commonly called the 'Van Ness Ordinance'; and, whereas, it is doubtful whether or not the said claims of the said possessors of the said lands are well founded in fact and in law, and also, whether the said claims of the said Commissioners of the Funded Debt have not become barred by the Statutes of Limitation of this State; therefore—

" *The People of the State of California, represented in Senate and Assembly, do enact as follows :*

" SECTION 1. Upon receiving a petition from any person or persons, claiming that they, by themselves, their tenants, or the persons through whom they claim or derive possession, have been, from and including the first day of January, in the year one thousand eight hundred and fifty-five, and still are, in the actual possession of any of the lands conveyed to the Commissioners of the Funded Debt of the city of San Francisco, by the Commissioners of the Sinking Fund of said city, according to the provisions of section twelve of an act entitled an act to authorize the funding of the floating debt of the city of San Francisco, and to provide for the payment of the same, passed May 1st, in the year one thousand eight hundred and fifty-one, and that such lands have not been sold, leased, dedicated, reserved, or conveyed, by the said Commissioners of the Funded Debt, to any one, or for any purpose, and that such claimant or claimants were the purchasers of such lands so claimed by them for a valuable consideration, and asking for a grant of such lands under the provisions of this act—the said Commissioners of the Funded Debt shall proceed to take testimony as to the matters alleged in such petition. Full and accurate notes of such testimony shall be made and preserved; all documentary testimony

Babcock *v.* Middleton.

shall be copied in full, and the testimony of witnesses shall be made in writing, signed by the witnesses, and attested by the Commissioner taking the same. Any one or more of the said Commissioners of the Funded Debt shall be competent to take such testimony, and to administer the requisite oath or affirmation, on taking the same, and in all proceedings under this act, as well as for the purpose of verifying the petition aforesaid. Such petition shall be verified by the oath or affirmation of the party in whose behalf the same is presented; or, in case it shall appear that he is absent from the State, or from any other cause, is incapable of verifying the same in his own person, the same may be verified by his agent or attorney in the premises, before one of the Commissioners of the Funded Debt, or before any officer authorized to take affidavits to be read in Courts of record. Any person who shall be guilty of willful false swearing in any material matter provided for in this act, shall be adjudged to be guilty of the crime of perjury, and shall suffer the penalty thereof."

Section two provides that the Commissioners shall determine whether the petitioner is entitled to a grant, and if so, award it, and make publication of the fact for three weeks in a daily newspaper, published in San Francisco.

Section three provides that on proof of such publication, and on payment of the amount of moneys agreed upon, the Commissioners shall convey the lands to the petitioner; but also provides that counter claimants may withdraw the adjudication of a claim into Courts of law, in which case the conveyance is to be withheld until the issue of the litigation, and then delivered to the successful party.

Section four provides for assessing the value of the lands in money, and empowers the Commissioners of the Funded Debt to convey the lands to the petitioner, on the payment of the expenses of the respective proceedings, and of the sum of money agreed upon, which shall be " at least ten per cent. of the assessed value."

Section five provides for the issue of the conveyance, its form, its recitals, the effect of the deed, and reiterates the provisions of section four in respect to the payment of the expenses and of the price agreed upon.

Section six reserves the rights of third persons, in all respects, both in law and equity.

Section seven provides that the act shall be executed within a year from the date of its passage, provided that if the Commissioners are hindered in any proceeding' by any process of law, the time during which they are so hindered shall not be taken to be a part of the year, so far as that proceeding is concerned.

Babcock and Walker, the respondents, presented their petition to the Commissioners of the Funded Debt, in conformity with section one of this act of 1862, but the Commissioners refused to entertain it. The respondents then applied to the District Court of the Fourth Judicial District in and for the county of San Francisco, for a peremptory writ of mandamus, to compel the Commissioners to entertain the petition, and carry the proceeding forward to its conclusion. The District Court awarded this mandamus, and the Commissioners appeal.

*Henry H. Haight,* for Appellants.

I.    The act of May 1st, 1851, organizing the Board of Commissioners of the Funded Debt, and the bonds issued in pursuance thereof, constitute a contract, the obligation of which it is beyond the power of the Legislature to impair. The security in the hands of the Commissioners cannot be diminished by any subsequent legislation, without contravening both the Federal and State Constitutions. (Federal Constitution, art. 1, sec. 10; State Constitution, art. 1, sec. 16; *People* v. *Woods,* 7 Cal. 579, 584; *People* v. *Bond,* 10 Id. 563, 566; *People* v. *Supervisors of San Francisco County,* 12 Id. 300; *Thornton* v. *Hooper,* 14 Id. 11; *Board of Education* v. *Fowler,* 19 Id. 11.)

II.    As a part of the contract created under the act of 1851, the Commissioners of the Funded Debt hold the real estate in trust, to secure the redemption of the bonds. (Act of 1851, section 12, and other sections; Session Laws of 1851, 387, 390; *Hubbard* v. *Sullivan,* 18 Cal. 508; *Board of Education* v. *Fowler,* 19 Id. 11; *Wheeler* v. *Miller,* 16 Id. 124; *Holladay* v. *Frisbie,* 15 Id. 630; *Leonard* v. *Darlington,* 6 Id. 123, 125; *Smith* v. *Morse,* 2 Id. 524.)

Babcock *v.* Middleton.

The real estate is either held by the Commissioners under a valid title, or they have no interest in it.

III. The Act of April 14th, 1862, appears from its terms to be in part for the benefit of those holding adversely to the Commissioners, who are trustees of the bond-holders ; and it changes the twelfth section of the Act of 1851, by directing the Commissioners to convey to these adverse claimants, upon the payment of a per centage on the assessed value. (Act of 1862, sec. 4, 219.)

IV. In considering the constitutionality of the Act of 1862, it becomes material to inquire, whether the Commissioners have the power to fix the per centage, or whether it is regulated by the act at ten per cent., leaving the Commissioners no discretion. If the latter is the only, or necessary construction, the act is clearly inoperative. The fourth and fifth sections are referred to on this point.

*John W. Dwinelle* and *H. P. Hepburn*, for Respondents.

I. The power to direct the mode in which the real estate of the city of San Francisco shall be sold, and the proceeds applied to the payment of certain city debts, is a power which has always been reserved by the Legislature.

By Act of 1851, section fourteen, " the nett proceeds of all real estate belonging, or that might thereafter belong to the city," were pledged to the payment of the indebtedness of the city of San Francisco existing on April 15th, 1851, the date of the passage of that act.

By section fifteen of the same act, the " then existing debts of the city" (April 15th, 1851) might be funded under direction of the Common Council, at a rate not exceeding ten per cent. per annum.

These two sections dedicated the lands of the city to the payment of the then existing debts of the city, and gave the city creditors a right to have all the lands of the city sold for the payment of those debts ; but did not prescribe the mode of sale. It was therefore left for the Legislature to prescribe thereafter the mode of sale, which might have been determined to be public or private, by open competition or by sealed proposals, for cash or on credit.

By " an Act to authorize the Funding of the Floating Debt of the

42

city of San Francisco, and to provide for the payment of the same,"
passed May 1st, 1851, sections one, two, and nine, Commissioners
were appointed to fund the floating debt of the city of San Francicso,
contracted on or before May 1st, 1851, and to exchange the bonds
of the city for such floating debt. By section twelve of the same act,
the Commissioners of the Sinking Fund of the city of San Fran-
cisco were required to convey to the Commissioners of the Funded
Debt all the property of the city; and the Commissioners of the
Funded Debt were endowed with the "right, at such time and
place as in their discretion the interest of the city may require, to
expose at public sale, or to lease the said property," and to devote
the proceeds to the payment of the city debts.

The effect of this section, taken by itself, was to give the Com-
missioners of the Funded Debt a right to sell this property at pub-
lic sale, in their discretion; but this did not prevent the Legislature
from adding thereafter still larger powers of sale; as, for example,
the right to sell at private sale, provided the proceeds were still
devoted to the payment of the city debts.

Section thirteen of the same Funding Act repeals the above
cited section fifteen, authorizing the Common Council to fund the
city debts, but the preceding section fourteen of the same act
stood unrepealed.

The effect of all which legislation, taken together, was this: that
a creditor holding indebtedness which existed on April 15th, 1851,
could have insisted that he, and his cocreditors of that date, had
the first lien on all the real estate of the city, under section four-
teen of the city charter, and that enough of such real estate should
be sold to satisfy all that class of creditors. Or he and his cocred-
itors of that class might come in under the Special Funding Act of
1851, and exchange their indebtedness for funded bonds; but, in
that case, they would be compelled to permit those city creditors
whose debts originated between April 15th, 1851 and May 1st,
1851, to share with them in the proceeds of the real estate of the
city.

As matter of fact, there was no city indebtedness existing on
April 15th, 1851, which has not been paid or funded under the
Special Funding Act of May 1st, 1851.

But, by permitting another class of creditors to share with them in a fund which they might have claimed exclusively, the creditors of April 15th, 1851, did not abandon their claim on the city lands, nor their right to have them sold to pay their debts, under section fourteen of the city charter of 1851 ; nor did the Legislature, in giving the Commissioners of the Funded Debt the " right " to sell at public auction, by section twelve of the Special Funding Act of 1851, intend to deprive itself of the power of prescribing other modes of sale.

It is suggested that section fourteen of the charter of 1851, which thus devoted all the lands of the city to the payment of the city debts, has been repealed.     The whole of that charter was repealed in 1855 ; but in the repealing act, there is a reservation in favor of then existing valid contracts, in which general terms the funded bonds of the city are included ; and the same exception would have resulted from those clauses in the State and National Constitutions which forbid the passing of laws impairing the obligation of contracts.     (Laws of 1855, 267.)

II.    The Funding Act of 1851 is a contract between the city of San Francisco and her creditors ; yet it is a contract, the mode of whose execution may be modified for a purpose beneficial to the bond holders.    To this proposition we cite : ( *Tallant* v. *Woods*, 7 Cal. 579 ; *People* v. *Bond*, 10 Id. 563 ; *Thornton* v. *Hooper*, 14 Id. 6).

It is not a contract, all of whose terms are absolute and fixed; on the contrary, it can be altered and amended " in such particulars as would serve to carry out the trust more fully, provided such amendment did not destroy the fund, or impair the security which the law had offered to the bond-holders." ( *People* v. *Woods*, 7 Cal. 584; *Thornton* v. *Hooper*, 14 Id. 11, 12.)    In the latter case it is decided, that a legislative amendment will be sustained where its effect will be beneficial to the bond-holder.

The principle lying at the bottom of these, and of the like decisions, is that which distinguishes between the obligation of a contract, and the remedy or means of enforcing it.    (Story on the Constitution, secs. 1379, 1380.)

III.    The act entitled " An Act to authorize the Commissioners

of the Funded Debt of the city of San Francisco to compromise and settle certain Claims to Real Estate, and to convey such Real Estate pursuant thereto," (Laws 1862, 217) is beneficial to the bond-holder.

The whole scope of the law is to authorize the Commissioners of the Funded Debt to ascertain whether they cannot, at private sale, sell to advantage certain property heretofore conveyed to them for the purposes of their trust; and, if they are satisfied by such investigation that such sale can be had, then to make it, and convey the land to the purchaser.

What lands are thus authorized to be sold? Only those described in the preamble and first section of the act. (Laws 1862, 217, 218.) They are lands of which the Funding Commissioners, now in the twelfth year of their trust, have never had any possession. Lands which have never been " sold, leased, dedicated, reserved, or conveyed, by the said Commissioners to any one or for any purpose." Lands which have been sold adversely to the Commissioners on judgments and executions against the city, at sales which this Court for years adjudged to pass the title; for no other meaning can be attached to the phrase " purchasers in good faith and for valuable considerations" in the preamble and first section of the act. Lands which have been " actually occupied" by the adverse holders for more than seven years. Lands, the most or all of which have been sold for taxes, and not redeemed. Lands whose marketable value is further clouded by a doubt as to the effect of the Statute of Limitations upon this long continued adverse possession, under laws of 1855, 109, section one, relating to actions brought for lands claimed under Spanish or Mexican titles.

An opinion has considerable currency at the bar, that this Statute of 1855, giving the period of five years after the final confirmation of a Spanish or Mexican title, within which an action may be brought by a party claiming real estate or the possession thereof under such title, applies only to cases in which the validity of a Spanish or Mexican title comes directly in question, and does not apply to cases where the parties litigating claim from a common source of title below a Spanish or Mexican grant, but remotely issuing out of it,—*e. g.*, that if A derive title from a Spanish or

Mexican grant, and convey to B, and B conveys to C, and then E and F both claim the title of C, the statute does not apply, because the title of C is admitted, and the original source is not in question. *Cessante ratione cessat et lex.* Whether these views are well or ill founded, and although this Court cannot be supposed to have any doubt as to the law on this point, still we are to consider what the effect of so important a point, yet undecided, would be upon the minds of buyers and sellers.

If we take all these questions in their aggregate influence and effect upon the public mind, can it be doubted that they would depress, almost to zero, the price of these lands, if offered at public sale ? Who would bid for such property in the face of an adverse possession fortified by so many apparent securities of title ? Only the speculator, who would be depressed by his fears, and bid only that minimum price which represents a gambling investment; and the adverse holder, whose bid would only exceed that of his speculating competitor. But the actual holder, who has already purchased in good faith; who has held the lands for years; who perhaps has dedicated them as a homestead, and to whom they have become endeared by use and association, if allowed to negotiate at private sale, will act under the double stimulus of hope and fear, and offer as much for the lands as he feels able to give.

These considerations seem to demonstate, that the Act of 1862 is a beneficial one to the bond-holders, as enabling them to obtain something from these lands, at least greatly in excess of what they would otherwise receive.

Furthermore : it is alleged by the respondents, that the defendants have no funds wherewith to pay the expenses of litigating the title of these lands with the adverse holders. This the defendants deny; but it cannot be denied that such a litigation would require the investment of a large amount of money, all of which would be put at risk, and much of which, such as that portion paid as counsel fees, could never be recovered. The act, then, provides a safe, rapid, and apparently largely productive method of converting these lands into money, as contrasted with really only one alternative of a protracted, expensive and hazardous litigation.

In *Thornton* v. *Hooper*, (14 Cal. 12) this Court decided that the

Legislature had the power to direct the Funding Commissioners to redeem the bonds of the city at a premium of five per cent., although section fourteen of the funding act provided that they should not be redeemed at a rate higher than par; but the decision was put distinctly on the ground that the Court could itself perceive that the act was beneficial to the bond-holders, and so had the power to determine that fact; and further, that the Court would pronounce of any other or higher rate of redemption that might be directed by the Legislature, whether it was beneficial or not.

IV.   The Act of 1862 does not compel the Commissioners to sell or convey any lands to the adverse holders, nor does it limit or restrain their discretion to demand full value of the lands, but merely enlarges their powers.

The title of the act is to " authorize " the Commissioners of the Funded Debt to do certain acts.  The provisions of the act then prescribe the means of determining, beyond dispute, that the petitioner is in a position to claim the benefit of the act; for any counter claimant can, under the provisions of section three, withdraw all questions of law and of fact to the forum of the Courts.  The value of the lands is then to be fixed, and a rate of per centage upon this value established by the Commissioners, as the purchase price of the lands.   The per centage may be above or below the appraised value ; like the quotation of a marketable stock, it may be twenty per cent., or one hundred and twenty per cent.   The act itself, section four, provides that the amount agreed upon and paid, shall be " at least ten per cent. of the assessed value."   This limits the Funding Commissioners in one direction, namely—that they shall not sell for less than a certain amount.   But, in the other direction, they are nowhere limited in their power to " compromise and settle."   It may be conceded, that if they had been directed to convey for a fixed per centage of ten per cent., the act would have been unconstitutional, for the reason that it deprived an intelligent board of the discretion originally vested in them by the Legislature, and reduced them to the condition of merely ministerial officers.   But the very phrase " at least " suggests the idea of " more," and is in harmony with the spirit of the whole act. The words " per centage " used in section five of the Act of 1862,

refer for their definition to section four of the same act; and sections four and five are to be read together.

The Funding Commissioners are, then, not bound to compromise or convey lands in any instance ; for, as they have the power to fix the price, they can fix it so high as to be prohibitory to the petitioner.   It is only when they have prescribed the terms, and the price has been paid, that they are permitted to make any conveyance.   All that the statute renders obligatory upon them, is to entertain the petition of the occupant, and proceed to ascertain whether or not they can make a sale to him on terms satisfactory to their own judgment.   They can still control the result, by the adjustment of the price ; and in that discretion the Legislature cannot overrule them, nor has it attempted to do so.

FIELD, C. J. delivered the opinion of the Court—COPE, J. and NORTON, J. concurring.

The Act of May 1st, 1851, to authorize the funding of the floating debt of the city of San Francisco, and to provide for the payment of the same, directs, in its twelfth section, the Commissioners of the Sinking Fund, created by a previous ordinance of the city, to convey to the Commissioners of the Funded Debt created by the act certain property belonging to the city, and empowers the latter Commissioners " to expose at public sale or to lease " the property at such time and place as in their discretion the interest of the city may demand ; and requires them to apply the proceeds of such sale or lease to the liquidation of the floating debt.   Soon after the passage of the act, the Commissioners of the Sinking Fund executed the conveyance directed.   The property consisted chiefly, if not entirely, of real estate situated in the city of San Francisco.   Portions of this real estate, it is alleged, have never been " sold, leased, dedicated, reserved or conveyed by the Commissioners," but are in the actual possession of parties " who have purchased the same in good faith and for valuable considerations," and who, by themselves, or tenants, or persons through whom they claim, have been in such actual possession from and including January 1st, 1855.   And by virtue of such actual possession, and the operation of an ordinance passed by the Common Council of the city of San Francisco on the

twentieth of June, 1855, commonly known as the Van Ness Ordinance, and the Act of the Legislature of March, 1858, confirmatory thereof, those parties, it is further alleged, claim to have become entitled to the interest and estate of the city.   It is also suggested that the claims of the Commissioners of the Funded Debt to the real estate thus adversely possessed have become barred by the Statute of Limitations.   Acting upon these allegations and this suggestion, and reciting them as the basis of its legislation, the Legislature, on the fourteenth of April of the present year, passed an act authorizing the Commissioners of the Funded Debt to compromise and settle with the parties, thus holding adversely to them, portions of the real estate conveyed by the Commissioners of the Sinking Fund.   (Laws of 1862, ch. 203.)   The act provides that upon receiving a petition from persons thus claiming and in possession of portions of the real estate in question, alleging that they have been in the actual possession, by themselves, their tenants or parties through whom they claim, from and including January 1st, 1855 ; that the lands thus possessed have not been " sold, leased, dedicated, reserved or conveyed " by the Commissioners, and that the petitioners are purchasers of the same for a valuable consideration, and asking for a grant of the lands, the Commissioners of the Funded Debt shall proceed to take testimony as to the matters alleged ; and empowers them upon proof of the matters to award a grant, and upon payment of the expenses of the proceedings, and at least ten per cent. of the assessed value of the property, to execute a conveyance to the petitioners.   Various provisions are embodied in the act to prevent fraud, and insure good faith in the proceedings, and to protect the rights of third persons, which it is unnecessary to notice for the disposition of the present case.   It is sufficient to observe that the act is drawn with care, and is well calculated to protect the just rights of all parties, and to assure to the Commissioners of the Funded Debt a full equivalent for their title—such as under the circumstances they could obtain from a public sale of the property.

To this act objection is taken by the Commissioners.   It is contended by them that it is unconstitutional, on the ground that it impairs the obligation of the contract which the Act of May 1st, 1851, authorized between the city and her creditors.   It is true,

Babcock v. Middleton.

the act in question authorized a contract between the city and her creditors; and the contract having been executed, its obligation cannot be impaired by any subsequent modification or repeal of the act. By it the creditors of the city, having at the time claims presently payable, were invited to exchange them for bonds payable at a distant period, and drawing a reduced rate of interest; and as a consideration for such exchange, the proceeds derived from certain real property of the city were, among other things, pledged for the payment of the bonds. The object of the provision requiring a public sale of the property, when a sale is made, is to secure a fair price from the purchasers. If this object can be accomplished by a sale in any other mode, the obligation of the contract is not impaired by legislation authorizing such other mode. That the just value in money of the title acquired by the Commissioners might be obtained, was all the act contemplated from the sale. If that title is questionable; if adverse claims are asserted to the property by parties who " are purchasers in good faith and for valuable considerations ;" and especially, if the title is clouded by a doubt as to the effect of the Statute of Limitations, a public sale would seldom produce more than a mere nominal sum. At a sale under such circumstances, few persons other than speculators would venture to bid. Property thus situated can, as a general thing, be more advantageously disposed of at private sale. Claims to property thus situated are the proper subjects of compromise by private negotiation. By the act in question, the Commissioners of the Funded Debt are authorized to compromise and settle such claims, with a limitation that they are in no event to receive, in consideration of their conveyance, less than ten per cent. upon the assessed value of the property. They may require a greater per centage. They may even exact the full value of the property. The limitation is only in one direction. The act is not, therefore, obnoxious to any constitutional objections; it does not impair the security of the bond-holders; it does not divert the proceeds which may be received from the payment of the funded debt; it only provides a new mode for the disposition of those portions of the property which cannot be advantageously disposed of at public sale, in consequence of existing doubts as to the title of the Commissioners. It is an act, in our

Babcock *v.* Middleton.

judgment, beneficial to the bond-holders, by which the Commissioners will be enabled to obtain an amount for the liquidation of the funded debt greater than would be derived by them from a public sale of the property, and without the expense of any litigation.

In *Thornton* v. *Hooper* (14 Cal. 9) the Court held that the Act of 1858, authorizing the Commissioners of the Funded Debt to purchase stock or bonds issued by them at a *premium* of five per cent., was constitutional, although the funding Act of 1851 declared that no stock should be purchased by them at a price higher than par. The decision was placed on the ground that the act was beneficial to the bond-holders, (and this the Court could itself perceive from the facts of the case) and did not impair the security provided for the payment of the funded debt. "It must be remembered," said the Court, "that the Act of 1851 is a law as well as a contract. It is not, in all its provisions, absolutely unchangeable. While in its substantive provisions it partakes of the nature of a contract, and has the sanctity and inviolability of one, yet it is of the very nature of the law, that those of its provisions which are merely legislative modes to give effect to the substantial purposes of the act, may need revision and alteration. The details may, as in other laws, be altered, where the alteration does not affect the security of the bond-holders. New provisions may be added for their security, and other provisions may be added for the protection or security of the city. The Constitution does not inhibit all legislation in respect to contracts; it only forbids the impairing of their obligation. The fund here raised is sacred to the objects to which the act devotes it. · The fund cannot be impaired or diverted from the object; but, we apprehend, if a large surplus accumulates, that surplus might be applied to the payment of bonds, even if no provision existed in the act for such payment before they were due; and this, though they had to be paid in full, and although the money placed out at interest *might* be much more in amount when the bonds matured than the sum of the bonds and interest. The fund is amply sufficient to pay these debts, and the security is not at all impaired by the calling in of the bonds at the rates proposed by the amendatory act. Indeed, the security of these creditors, as the respondents' counsel well argues, is increased by this process; for the best invest-

Babcock *v.* Middleton.

ment a public body can make of its surplus money is to pay its debts. It is true, that possibly the money might be used to greater profit; but all experience shows that the result is nearly always otherwise, and that as a general thing, no speculation a municipal corporation can be expected to enter into will make a profit of *five per cent.* for the first year, and *ten per cent. per annum* for a series of years afterward."

Judgment affirmed.